Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Petitioner,

v.

COEUR d'ALENE TRIBAL FARM, Respondent.

No. 84–7031.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 1984.

Decided Jan. 15, 1985.

Sandra D. Lord, U.S. Dept. of Labor, Washington, D.C., for petitioner.

Gary T. Farrell, Dellwo, Rudolf & Schroeder, Spokane, Wash., for respondent.

Before WRIGHT, SNEED, and ALAR-CON, Circuit Judges.

SNEED, Circuit Judge:

██ The Secretary of Labor appeals a decision of the Occupational Safety and Health Review Commission vacating citations and penalties assessed against the Coeur d'Alene Tribal Farm. We reverse the Commission's decision and hold that the Occupational Safety and Health Act applies to the commercial activities carried on by the Coeur d'Alene Tribal Farm.

## I.

### FACTS AND PROCEEDINGS BELOW

The Coeur d'Alene Indian Tribe (the Tribe) occupies a 350,000 acre reservation in northern Idaho. Although the Tribe is organized under federal law, it has no formal treaty with the United States government.

The Coeur d'Alene Tribal Farm (the Farm) is a commercial enterprise wholly owned and operated by the Tribe. The Farm produces grain and lentils exclusively for sale on the open market both within and outside Idaho. It employs approximately twenty workers, some of whom are non-Indians. The Farm manager is himself a non-Indian. Apart from its tribal ownership, the Farm is similar in its operation and activities to other farms in the area.

In October, 1978, a compliance officer from the Occupational Safety and Health Administration (OSHA) conducted a consensual inspection of two grain elevators on the Farm. He issued citations for 21 alleged violations and proposed a $185 fine. The Farm has not disputed the facts on which the citations were based.

The Farm did, however, challenge OSHA's authority to conduct health and safety inspections and has argued that Congress did not intend the Occupational Safety and Health Act, 29 U.S.C. §§ 651–678 (1982) (the Act), to apply to the Farm. The dispute was referred to an Administrative Law Judge (ALJ) who affirmed the citations and proposed penalty. The Farm petitioned the Occupational Safety and Health Review Commission (the Commission) for review, which the Commission granted on the issue of the Act's applicability to tribal enterprises. The Commission remanded the case to the ALJ in light of its decision in *Navajo Forest Products Industries*, 8 O.S.H.Cas. (BNA) 2094, *aff'd*, 692 F.2d 709 (10th Cir.1982). The ALJ reaffirmed its decision and the Farm again petitioned for and was granted review on the issue of the Act's applicability to tribal enterprises.

On November 16, 1983, the Commission reversed the ALJ's decision and vacated the citations. From this decision the Secretary of Labor appeals.

## II.

## DISCUSSION

The Occupational Safety and Health Act is a statute of general applicability and broad remedial purpose designed to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources ...." 29 U.S.C. § 651(b) (1982). The Act's coverage is comprehensive and we believe that its definition of employer clearly includes the Coeur d'Alene Tribal Farm.[1] The Farm, however, contends that its inherent sovereign powers bar application of the Act to its activities absent an express congressional decision to that effect. We disagree.

**1.** The Farm is an "organized group of persons ... engaged in a business affecting commerce who has employees ...." *See* 29 U.S.C. § 652 (1982). Congress expressly excluded only "the United States or any State or political subdivision of a State" from the broad definition of "employer" in the Act. *Id.*

No one doubts that the Tribe has the inherent sovereign right to regulate the health and safety of workers in tribal enterprises. But neither is there any doubt that Congress has the power to modify or extinguish that right. Unlike the states, Indian tribes possess only a limited sovereignty that is subject to complete defeasance. *See Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 3295, 77 L.Ed.2d 961 (1983). *Cf. National League of Cities v. Usery*, 426 U.S. 833, 426 U.S. 833, 49 L.Ed.2d 245 (1976). The issue raised on this appeal is whether Congress *intended* to exercise its plenary authority over Indian tribes. More precisely, it is whether congressional silence should be taken as an expression of intent to exclude tribal enterprises from the scope of an Act to which they would otherwise be subject.

### A. *The General Rule*

The Secretary relies on *FPC v. Tuscarora Indian Nation*, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), for the principle, "now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." *Id.* at 116, 80 S.Ct. at 553. The Farm may be correct when it argues that this language from *Tuscarora* is dictum, but it is dictum that has guided many of our decisions. As Judge Choy, writing for himself in *United States v. Farris*, 624 F.2d 890 (9th Cir.1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 919, 66 L.Ed.2d 839 (1981), has said: "federal laws generally applicable throughout the United States apply with equal force to Indians on reservations."[2] *Id.* at 893. Many of our decisions have upheld the application of general federal laws to Indian tribes; not one has held that an otherwise applicable statute should be interpreted to exclude Indians. *See, e.g., Confederated Tribes of*

**2.** Both Judges Browning and Kennedy wrote separately in *Farris*, but neither disagreed with Judge Choy's statement of basic principle that generally applicable federal statutes ordinarily apply to Indian tribes and their activities.

*Warm Springs Reservation of Oregon v. Kurtz,* 691 F.2d 878 (9th Cir.1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983) (holding that absent a "definitely expressed exemption" tribes and their members are subject to federal excise taxes); *United States v. Fryberg,* 622 F.2d 1010 (9th Cir.), *cert. denied,* 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980) (holding that Eagle Protection Act abrogates treaty hunting rights); *Fry v. United States,* 557 F.2d 646 (9th Cir.1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 754 (1978) (holding that Indian logging operations are subject to federal taxes); *United States v. Burns,* 529 F.2d 114 (9th Cir.1975) (holding that federal gun control law applies to Indians, citing *Tuscarora*). *See also Navajo Tribe v. NLRB,* 288 F.2d 162 (D.C.Cir.), *cert. denied,* 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed.2d 387 (1961) (holding that National Labor Relations Act applies to employers located on reservation lands). In short, we have not adopted the proposition that Indian tribes are subject only to those laws of the United States expressly made applicable to them. Nor do we do so here.

## B. *The Exceptions*

The above cases and the principles on which they rest suggest that the Occupational Safety and Health Act should apply to the Farm. There are, however, three exceptions to this principle. A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches "exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations ...." *Farris,* 624 F.2d at 893–94. In any of these three situations, Congress must *expressly* apply a statute to Indians before we will hold that it reaches them.

The Farm argues that it is saved from the strictures of OSHA under the first two

of these exceptions. We believe that neither is applicable in this case.

(1) *The "Aspects of Tribal Self-government" Exception*

■ First, the Farm argues that the application of OSHA regulations would interfere with rights of tribal self-government and therefore requires a "clear" expression of congressional intent to apply the Act to tribal enterprises. The Farm's argument proves far too much. To accept it would bring within the embrace of "tribal self-government" all tribal business and commercial activity. Our decisions do not support an interpretation of such breadth. For example, if the right to conduct commercial enterprises free of federal regulation is an aspect of tribal self-government, so too, it would seem, is the right to run a tribal enterprise free of the potentially ruinous burden of federal taxes. Yet our cases make clear that federal taxes apply to reservation activities even without a "clear" expression of congressional intent. *See, e.g., Confederated Tribes of Warm Springs Reservation of Oregon v. Kurtz,* 691 F.2d 878 (9th Cir.1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983). We believe that the tribal self-government exception is designed to except purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes apply to Indian tribes. *See Farris,* 624 F.2d at 893.

The operation of a farm that sells produce on the open market and in interstate commerce is not an aspect of tribal self-government. Because the Farm employs non-Indians as well as Indians, and because it is in virtually every respect a normal commercial farming enterprise, we believe that its operation free of federal health and safety regulations is "neither profoundly intramural ... nor essential to self-government." *Id.*

In a variation on the general theme of tribal self-government rights, the Farm argues that the Tribe's right to exclude non-Indians, including OSHA inspectors, from

its reservation is a "fundamental aspect" of tribal sovereignty that cannot be infringed without a clear expression of congressional intent. We have never employed this "fundamental aspect of sovereignty" formulation of the tribal self-government exception to the general rule that federal statutes ordinarily apply to Indians, and we decline to do so now.

The Farm looks for support for this variation of the general theme to the Supreme Court's recent decision in *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), which, it argues, overrules *Tuscarora* (and presumably our own rule as well), at least to the extent that *Tuscarora* allows Congress to silently or implicitly infringe sovereign tribal rights to exclude non-Indians from tribal lands. *Merrion,* the Farm says, requires that any modification of the fundamental sovereign right to exclude non-Indians be clearly expressed. We believe that this argument misconstrues the Supreme Court's decision.

It is true that *Merrion* recognizes that "a hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands ...." *Merrion,* 455 U.S. at 141, 102 S.Ct. at 904. However, to assume that this language bars the application of the Act to Indian tribes in the absence of clearly expressed congressional intent to that effect, ignores the fact that the issue of tribal sovereignty in *Merrion* arose in a context very different from the one presented here. *Merrion* discussed the tribal power to tax non-Indians who enter reservations · for commercial purposes and said that the right to exclude and tax non-Indians was a "hallmark" of sovereignty. It in no way addressed Congress' ability to modify those rights through the exercise of its plenary powers. Unlike the Secretary in this case, the non-Indian petitioners in *Merrion* could point to no statute of general applicability that even appeared to modify the tribe's

sovereign power to tax or exclude. *See Merrion,* 455 U.S. at 149–52, 102 S.Ct. at 908–10.

### (2) *The "Treaty Rights" Exception*

■ The Farm also appears to argue that the Act cannot apply to its activities absent a clear expression of congressional intent because application of the Act would infringe treaty rights. Indeed, the Tenth Circuit's recent holding in *Donovan v. Navajo Forest Products Industries,* 692 F.2d 709 (10th Cir.1982), in which the Act was held *not* to apply to a tribal enterprise, arguably depended on the finding that the Navajo Tribe's right to exclude non-Indians was explicitly protected by a treaty with the United States government.[3] The Tenth Circuit stressed that "*Tuscarora* did not ... involve an Indian treaty. Therein lies the distinguishing feature between the case at bar and the *Tuscarora* line of cases, which stand for the rule that under statutes of general application Indians are treated as any other person, unless Congress expressly excepts them therefrom." *Navajo Forest,* 692 F.2d at 711. We also "presume[ ] that Congress does not intend to abrogate rights guaranteed by Indian treaties when it passes general laws, unless it makes specific reference to Indians." *Farris,* 624 F.2d at 893.

■ In this case, however, there is no treaty between the Coeur d'Alene Tribe and the United States government. Nor can the Farm point to any document to which the United States is a signatory that specifically guarantees the Tribe's right to exclude non-Indians. Even the "ratified articles of agreement" to which the Farm refers have no such provision. Thus, the Farm cannot avail itself of the "treaty rights" exception and must rely exclusively on the "aspects of tribal self-government" exception. As already indicated, that ex-

---

**3.** The Tenth Circuit's decision in *Navajo Forest* may rest in part on that court's belief that application of the Act to the tribal enterprise would "dilute the principles of tribal sovereignty and self-government recognized in the treaty." *Navajo Forest,* 692 F.2d. at 712. It is not clear

whether these "principles" would by themselves have had sufficient force to bar application of the Act. To whatever extent the Tenth Circuit's decision is not tied to the existence of an express treaty right, we disagree with it.

ception is also unavailable under the facts of this case.

#### (3) *The "Other Indications" Exception*

The Farm does not argue, and we do not believe, that the legislative history of the Occupational Health and Safety Act or the surrounding circumstances of its passage indicate any congressional desire to exclude tribal enterprises from the scope of its coverage.

REVERSED.