935 F.2d 182
 59 USLW 2760, 15 O.S.H. Cas.(BNA) 1089,
1991 O.S.H.D. (CCH) P 29,375
 U.S. DEPARTMENT OF LABOR, Petitioner,
v.
OCCUPATIONAL SAFETY & HEALTH REVIEW COMMISSION; Warm
Springs Forest Products Industries; the
Confederated Tribes of the Warm Springs
Reservation, Respondents.
 No. 90-70082.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 14, 1991.
Decided June 7, 1991.
 
 Ellen L. Beard, U.S. Dept. of Labor, Washington, D.C., for petitioner.
 Howard G. Arnett, Marceau, Karnopp, Petersen, Noteboom & Hubel, Bend, Or., for respondents.
 On Petition for Review of an Order of the Occupational Safety and Health Review Commission.
 Before FARRIS and TROTT, Circuit Judges, and DUMBAULD,* Senior District Judge.
 FARRIS, Circuit Judge:
 
 
 1
 The Secretary of Labor petitions for review of the Occupational Safety & Health Review Commission's determination that the Occupational Safety and Health Act, 29 U.S.C. Secs. 651-78, does not apply to the Warm Springs Forest Products Industries' sawmill, a mill owned and operated by the Confederated Tribes of Warm Springs. The Commission ruled that because OSHA regulations infringed on the Tribe's treaty rights, the Act could not be applied to them without express Congressional authority. We reverse and remand.
 
 Jurisdiction
 
 2
 We have jurisdiction of this timely appeal pursuant to 29 U.S.C. 660(b).
 
 Issue
 
 3
 Whether application of the Occupational Safety and Health Act to the Warm Springs Forest Product Industries' mill is barred by the Tribe's treaty with the United States?
 
 Background
 
 4
 The Confederated Tribes of Warm Springs reside on the Warm Springs Reservation in north-central Oregon. In 1967, pursuant to a corporate charter approved by the Secretary of the Interior in 1938, the Tribe established Warm Springs Forest Products Industries to process timber cut on the reservation into finished forest products for sale in interstate commerce.
 
 
 5
 The Warm Springs mill is located on the reservation and is owned and operated by the Tribe. As of July 31, 1988, the mill employed 327 workers. Of these, 132 were tribal members; 35 were married into the Tribe; 14 were Native Americans enrolled in other tribes; and 146 were non-Native Americans. During 1987, the mill had total sales of $33,595,361, virtually all of which were to buyers located outside the reservation.
 
 
 6
 The mill is managed pursuant to a plan of operation established by the Warm Springs Tribal Council. The plan of operation requires that the mill purchase timber only from tribally-owned forests on the reservation. Stumpage payments made by the mill to the Tribe are the largest source of income for the tribal government. In addition, the timber used at the mill is harvested almost entirely by logging companies owned by tribal members.
 
 
 7
 In December of 1988, following three inspections of the mill, OSHA issued citations for violations of safety and health standards. Citations for failure to enclose sprocket wheels and chains and for failure to cover exposed steam and hot-water pipes were classified as "repeat" violations of a type similar to those cited in a 1987 inspection. Also, a machine guarding violation was classified as "serious." The Secretary proposed a total fine of $2500 for these violations.
 
 
 8
 Following a hearing, the Occupational Safety and Health Review Commission dismissed the Secretary's complaints, ruling that the Tribe's treaty barred application of the Act. The decision became a final Commission order on December 15, 1989. This appeal followed.
 
 Standard of Review
 
 9
 Whether the Occupational Safety and Health Act applies to the Tribe's mill is a question of law reviewed de novo. See Confederated Tribes of Warm Springs Reservation v. Kurtz, 691 F.2d 878, 880 (9th Cir.1982), cert. denied, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983).
 
 Discussion
 
 10
 The Occupational Safety and Health Act is a statute of general applicability designed to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources...." 29 U.S.C. Sec. 651(b) (1982); see also Donovan v. Coeur d'Alene Tribal Farm, 751 F.2d 1113, 1115 (1985). Warm Springs Forest Products Industries falls within the broad definition of an employer under the Act. See Coeur d'Alene, 751 F.2d at 1115.
 
 
 11
 In Coeur d'Alene, we employed the established principle that " 'a general statute in terms applying to all persons includes Indians and their property interests'," id. (quoting FPC v. Tuscarora Indian Nation, 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960)), to hold that the Occupational Safety and Health Act applied to a commercial enterprise wholly owned and operated by a Native American tribe. We noted, however, three exceptions to this general principle:
 
 
 12
 A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches "exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations...."
 
 
 13
 Id. at 1116 (quoting United States v. Farris, 624 F.2d 890 (9th Cir.1980), cert. denied, 449 U.S. 1111, 101 S.Ct. 919, 920, 66 L.Ed.2d 839 (1981)). If an exception to the general rule applies, "Congress must expressly apply a statute to Indians before we will hold that it reaches them." Id.
 
 
 14
 The Occupational Safety and Health Act is not expressly applicable to Native American tribes. Thus, the Act may not be invoked against the Warm Springs mill if the facts of this case fall within one of the three exceptions.
 
 
 15
 1. The "Aspects of Tribal Self-government" Exception
 
 
 16
 Coeur d'Alene rejected the argument that the right to conduct commercial enterprises free of federal regulation is an aspect of tribal self-government. Id. We restricted the tribal self-government exception to "purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations." Id. The mill employs a significant number of non-Native Americans and sells virtually all of its finished product to non-Native Americans through channels of interstate commerce. Although revenue from the mill is critical to the tribal government, application of the Act does not touch on the Tribe's "exclusive rights of self-governance in purely intramural matters."
 
 2. The "Treaty Rights" Exception
 
 17
 The question central to this case is whether the Tribe's rights under the Treaty with the Tribes of Middle Oregon of June 25, 1855, 12 Stat. 963, bar application of the Act. The Tribe does not allege that the substantive requirements of the Occupational Safety and Health Act offend their rights. The Tribe's limited contention is that the entry of non-Native American OSHA inspectors on reservation land violates a general right to exclude non-Native Americans set forth in the Treaty. Thus, whether the treaty rights exception applies depends on two questions: (a) Whether the Treaty contains a general right to exclude non-Native Americans from the reservation; and (b) if so, whether such a general right of exclusion is sufficient to bar application of the Act.
 
 
 18
 (a) The right of exclusion
 
 
 19
 The Treaty specifies the boundaries of the reservation and provides, in pertinent part, that:
 
 
 20
 All of which tract shall be set apart, and, so far as necessary, surveyed and marked out for their exclusive use; nor shall any white person be permitted to reside upon the same without the concurrent permission of the agent and superintendent.
 
 
 21
 Treaty, Art. I, para. 3.
 
 
 22
 The Commission interpreted this provision of the treaty to "evidence[ ] an intent of the parties to exclude the white man from the reservation lands for any and all purposes except as therein enumerated."[1] Because OSHA enforcement requires entry on the reservation, the Commission held that application of the Act would infringe on the Tribe's right to exclusive use under the Treaty without explicit Congressional authorization.
 
 
 23
 The Secretary argues that the Treaty contains a right to exclude OSHA inspectors only from residing on the reservation.
 
 
 24
 Ambiguities in tribal treaties are construed liberally to favor Native Americans and to respect traditional notions of Native American sovereignty. See, e.g., County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985) ("[T]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. Thus, it is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."); Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 152, 102 S.Ct. 894, 909, 71 L.Ed.2d 21 (1982) ("[I]f there [is] ambiguity ... the doubt would benefit the tribe, for 'ambiguities in federal law have been construed generously in order to comport with ... traditional notions of sovereignty and with the federal policy of encouraging tribal independence.' ") (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143-44, 100 S.Ct. 2578, 2583-84, 65 L.Ed.2d 665 (1980)).
 
 
 25
 Under such canons of construction, we do not construe the term "reside" narrowly to cover only the exclusion of non-Native Americans from occupying reservation land. The Tribe presents evidence that the Treaty was designed to provide them land where they would be able to separate themselves from non-Native Americans. The Tribe's English vocabulary at the time the Treaty was entered into was extremely limited. Read within the context of the entire Treaty and in light of the history of Native American relations, the provision sets forth a general right of exclusion.
 
 
 26
 (b) The sufficiency of the right
 
 
 27
 The central question in this case is whether the general right of exclusion contained in this Treaty is sufficient to bar application of the Occupational Safety and Health Act to the Warm Springs mill.
 
 
 28
 The Tribe relies on Donovan v. Navajo Forest Products Industries, 692 F.2d 709, 711 (10th Cir.1982), wherein the Tenth Circuit found that a Native American treaty containing a general right of exclusion barred application of the Occupational Safety and Health Act to the tribe's sawmill. In Navajo Forest Products, the court distinguished between the rule of Tuscarora--that general statutes in terms applying to all persons include Native Americans--and the rule applicable when a general statute implicates rights set forth in a treaty. "Tuscarora did not ... involve an Indian treaty. Therein lies the distinguishing feature of the case at bar and the Tuscarora line of cases.... The Tuscarora rule does not apply to Indians if the application of the general statute would be in derogation of the Indians' treaty rights." Navajo Forest Products, 692 F.2d at 711.
 
 
 29
 In Coeur d'Alene, we expressly distinguished Navajo Forest Products because the Coeur d'Alene Tribe did not have a treaty with the United States. Coeur d'Alene, 751 F.2d at 1117. Although dicta in that case implied that the Navajo Forest Products analysis may prove persuasive where a treaty right of general exclusion existed, we did not directly consider the matter. We do so now.
 
 
 30
 In United States v. Farris, 624 F.2d 890 (9th Cir.1980), cert. denied, 449 U.S. 1111, 101 S.Ct. 919, 920, 66 L.Ed.2d 839 (1981), we found that the Organized Crime Control Act applied to proscribe gambling operations run on Native American land despite a treaty right of exclusion similar to that present in this case ("nor shall any white man be permitted to reside upon the same without the permission of the tribe and the superintendent and agent" 10 Stat. 1132-1133). Judge Choy, in an opinion separately concurred in by Judges Browning and Kennedy, stated that such a general "exclusive use" provision was not sufficient to preclude the application of a federal criminal statute. Id. at 893. Judge Choy restricted the treaty rights exception to only "subjects specifically covered in treaties, such as hunting rights." Id. He noted that to allow a treaty's general exclusion right to bar application of general laws unless Congress has expressly referenced Native Americans would "only necessitate a huge quantity of statutory boilerplate." Id.
 
 
 31
 Judge Choy's discussion in Farris is supported by Confederated Tribes of Warm Springs v. Kurtz, 691 F.2d 878 (9th Cir.1982), cert. denied, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (9th Cir.1982). In considering the Treaty at issue in this case, the Kurtz court rejected an argument that the Treaty barred application of the federal tax laws to the Tribe. Because the Treaty did not contain a specific provision exempting the Tribe from the tax laws, the Court did not find a treaty rights exception to the general rule of applicability. Id. at 882. The general right of exclusion was not sufficient to bar taxation.
 
 
 32
 Our discussion in Coeur d'Alene of the inherent right of Native American sovereignty also suggests that a generalized right of exclusion may not be sufficient to bar application of the Occupational Safety and Health Act. In Coeur d'Alene we recognized that Native Americans possess an inherent sovereign right, independent of express treaty language, to exclude non-Native Americans from their reservation. This right, which is analogous to the general right of exclusion contained in the Treaty, was insufficient to bar application of the Act. The identical right should not have a different effect because it arises from general treaty language rather than recognized, inherent sovereign rights.
 
 
 33
 The Tribe argues that Farris and Kurtz are distinguishable. They contend that the gambling prohibition and the imposition of taxes did not directly infringe on the right to exclude non-Native Americans from the reservation. Application of the Occupational Safety and Health Act they argue, is more intrusive because it involves inspection of reservation property by non-Native Americans.
 
 
 34
 The Tribe is correct that neither Farris nor Kurtz addressed whether the respective federal laws could be enforced by non-Native American entry onto reservation property. Nonetheless, in deciding that application of the laws to Native Americans was proper, the court implicitly ruled that the government was empowered to enforce the laws. Thus, Farris implicitly authorized federal officers to enforce the gambling prohibition by entering reservation property. This authority was made explicit by the Supreme Court in California v. Cabazon Band of Mission Native Americans, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). "Federal law enforcement officers have the capability to respond to violations of OCCA on Native American reservations, as is apparent from Farris...." Id. at 214 n. 16, 107 S.Ct. at 1090 n. 16. The tax code provides for government entry onto premises where taxable articles are kept. Such entry was also authorized implicitly by Kurtz.
 
 
 35
 OSHA inspections are not at will. OSHA inspectors must first obtain either the employer's consent or an administrative search warrant based on "specific evidence of an existing violation" or a "general administrative plan for the enforcement of the Act derived from neutral sources." Marshall v. Barlow's, Inc., 436 U.S. 307, 320-21, 98 S.Ct. 1816, 1825, 56 L.Ed.2d 305 (1978). Thus, entry onto the Tribe's reservation pursuant to the Occupational Safety and Health Act is limited to investigations necessary to effectuate the Act.
 
 
 36
 On the facts before us, we do not find the conflict between the Tribe's right of general exclusion and the limited entry necessary to enforce the Occupational Safety and Health Act to be sufficient to bar application of the Act to the Warm Springs mill. The conflict must be more direct to bar the enforcement of statutes of general applicability. Were we to construe the Treaty right of exclusion broadly to bar application of the Act, the enforcement of nearly all generally applicable federal laws would be nullified, thereby effectively rendering the Tuscarora rule inapplicable to any Tribe which has signed a Treaty containing a general exclusion provision. Farris and Kurtz do not suggest that a general exclusion provision should have such broad effect.
 
 3. The "Other Indications" Exception
 
 37
 The Tribe does not argue, nor did the Coeur d'Alene court find, that the legislative history of the Occupational Safety and Health Act or the surrounding circumstances of its passage indicate that Congress intended to exclude tribal enterprises from its coverage. Coeur d'Alene, 751 F.2d at 1118.
 
 Conclusion
 
 38
 The general "exclusive use" provision of the Treaty with the Tribes of Middle Oregon of June 25, 1855, 12 Stat. 963, does not bar application of the Occupational Safety and Health Act to the Warm Springs Forest Products Industries' sawmill. We remand to the Occupational Safety and Health Review Commission to reconsider the Secretary's complaint.
 
 
 39
 REVERSED and REMANDED.
 
 
 
 *
 Honorable Edward Dumbauld, Senior United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The Treaty provides that the President may require a right of way for non-Native Americans through the reservation for the purposes of roads, highways, and railroads necessary to the public interest. Treaty, Art. IX