Dear Executive Director Hare,
¶ 0 This office has received your request for an Attorney General Opinion in which you ask, in effect, the following question:
Do the provisions of the Federal Interstate Horseracing Act,15 U.S.C. §§ 3001-3007 apply to an off-track wagering facilityoperated by a federally recognized Indian Tribe under theprovisions of a Tribal-State gaming compact, entered into underthe provisions of the Indian Gaming Regulatory Act,25 U.S.C. §§ 2701-2721?
 INTRODUCTION
¶ 1 The question you pose requires examination of two federal statutes, one a general statute dealing with interstate horserace wagering, and the other a more specific statute which deals with gambling conducted by a federally recognized Indian Tribe on land over which the Tribe exercises jurisdiction.
¶ 2 As explained in more detail below, there are two ways in which provisions of the Interstate Horseracing Act could potentially be applicable to an off-track wagering facility operated by a federally recognized Indian Tribe:
 1. The provisions of the Interstate Horseracing Act of 1978 ("the Act") might, by virtue of its scope, dictate as a matter of federal law, that the Tribe comply with the provisions of the Act; or
 2. The Tribe, in a Tribal-State gaming compact, negotiated between the Tribe and the State under the provisions of the Indian Gaming Regulatory Act, could agree to comply with some or all provisions of the Interstate Horseracing Act of 1978, whether or not federal law alone dictated such compliance.
¶ 3 We begin our analysis of your question with a brief overview of the Indian Gaming Regulatory Act.
 I. OVERVIEW OF THE INDIAN GAMING REGULATORY ACT, 25 U.S.C. §§ 2701-2721
¶ 4 The Indian Gaming Regulatory Act ("IGRA") was enacted to provide a statutory basis for the operation of gaming by Indian Tribes as a means of promoting "tribal economic development, self-sufficiency, and strong tribal governments," and to further provide a statutory basis for the regulation of gambling by an Indian Tribe "adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players." 25 U.S.C. § 2702(1) and (2). IGRA divides gambling into three classes of gaming.
¶ 5 Class I gaming can be conducted by Tribes regardless of the State's public policy, and without regulatory involvement by either the State or the Federal Government, and consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations."25 U.S.C. §§ 2703(6) and 2710(a)(1).
¶ 6 Class II gaming includes bingo, and if played at the same location as bingo, also includes pull-tabs, lotto, punch boards, tip jars, and other games similar to bingo. 25 U.S.C. § 2703(7). While class II gaming is within a Tribe's jurisdiction,25 U.S.C. § 2710(a)(2), Tribes may only engage in class II gaming if such gaming is "located within a State that permits such gaming for any purpose by any person, organization or entity."25 U.S.C. § 2710(b)(A).
¶ 7 Class III gaming consists of all forms of gaming "that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8). Class III gaming includes, among other forms of gaming, casino gambling and horserace gambling. In order for an Indian Tribe to engage in any form of class III gaming, various conditions must be met, one of which is that class III gaming may only be conducted "in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710
(d)(1)(C). Additionally, class III gaming must be "located in a State that permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B).
¶ 8 The Tribal-State compact negotiated between a Tribe and a State allocates criminal and civil jurisdiction between the State and the Tribe and establishes the standards of the operation of class III gaming activities by the Tribe. 25 U.S.C. § 2710
(d)(3)(C). In negotiating a compact with a Tribe, a State may legitimately take into account the "adverse economic impacts" which the proposed class III gaming will have "on existing gaming activities." 25 U.S.C. § 2710(d)(7)(B)(iii)(I). Thus, in negotiating a Tribal-State compact, the parties could agree that the Tribe would operate its off-track wagering facilities in conformity with some or all of the requirements of the Interstate Horseracing Act; say for example, as a means of protecting the integrity of the Tribe's operation, and/or as a means of avoiding adverse economic impact on existing racetracks. Whether a particular Tribe, by virtue of an existing Tribal-State compact, is required to comply with some or all provisions of the Interstate Horseracing Act by virtue of an agreement in a compact is a question of fact, which cannot be determined in an Attorney General Opinion. 74 O.S. Supp. 1998, § 18b[74-18b](A)(5)
 II. THE PROVISIONS OF THE INTERSTATE HORSERACING ACT DO APPLY TO A FEDERALLY RECOGNIZED INDIAN TRIBE'S ACCEPTANCE OF INTERSTATE OFF-TRACK WAGERS, UNLESS THE APPLICATION OF A PROVISION OF THE ACT WOULD ABROGATE A SPECIFIC RIGHT GUARANTEED THE TRIBE BY A SPECIFIC TREATY.
¶ 9 In 1978, Congress found that States should have the primary responsibility for "determining what forms of gambling may legally take place within their borders," and that the Federal Government should prevent "interference by one State with the gambling policies of another, and should act to protect identifiable national interests." 15 U.S.C. § 3001(a)(1) and (2). Congress thus concluded that "in the limited area of interstate off-track wagering on horseraces," there was a need for federal action. 15 U.S.C. § 3001(a)(3). Policies established by Congress in the Interstate Horseracing Act were adopted "in order to further the horseracing and legal off-track betting industries in the United States." 15 U.S.C. § 3001(b).
¶ 10 Under Section 3003 of the Act, all persons are prohibited from accepting interstate off-track wagering except under the conditions set forth in the Act:
 No person may accept an interstate off-track wager except as provided in this chapter.
15 U.S.C. § 3003 (emphasis added).
¶ 11 The Act then imposes various requirements on the acceptance of interstate off-track wagers. For example, under15 U.S.C. § 3004, an interstate off-track wager may be accepted by an off-track betting system "only if consent is obtained from" the "host racing association,"[1] the "host racing commission[2] and the off-track racing commission."[3] Further, in addition to other requirements, any "off-track betting office" — the locations at which off-track wagers are accepted — is required to obtain approval of "all currently operating tracks within 60 miles of such off-track betting office."[4] 15 U.S.C. § 3004(b)(1)(A).
¶ 12 In the past, as exemplified by the United States Supreme Court's ruling in Elk v. Wilkins, 112 U.S. 94 (1884), "[g]eneral `acts of Congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them.'"Id. at 99-100. As held in Federal Power Commission v.Tuscarora Indian Nation, 362 U.S. 99 (1960) by the United States Supreme Court, it is now well-settled that a different rule of construction applies in determining Congress' intent to make its general acts applicable to Indians. In noting that the rule of construction in Elk v. Wilkins is no longer the law, the Supreme Court recognized that it is now well-settled that in general statutes the terms applying to all persons includes Indians and their property interests:
 The Tuscarora Indian Nation heavily relies upon Elk v. Wilkins, 112 U.S. 94, 5 S.Ct. 41, 28 L.Ed. 643. It is true that in that case the Court, dealing with the question whether a native-born American Indian was made a citizen of the United States by the Fourteenth Amendment of the Constitution, said: "Under the constitution of the United States, as originally established * * * General acts of congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them." 112 U.S. at pages 99-100, 5 S.Ct. at page 44. However that may have been, it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests.
Tuscarora Indian Nation, 362 U.S. 99, at 115-116 (emphasis added).
¶ 13 In applying the Tuscarora rule, the United States Court of Appeals for the Tenth Circuit in Nero v. Cherokee Nation ofOklahoma, 892 F.2d 1457 (10th Cir. 1989), noted as other circuit courts have, that there are three exceptions to the rule. The Tenth Circuit Court of Appeals described the three exceptions to the Tuscarora rule as follows:
 A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches "exclusive rights of self-governance in purely intramural-matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations. . . ." In any of these three situations, Congress must expressly apply a statute to Indians before we will hold that it reaches them.
 ¶ 14 Nero v. Cherokee Nation of Oklahoma, 892 F.2d 1457,1462-63 (10th Cir. 1989) (emphasis added) (quoting with approval from Donovan v. Coeur d'Alene Tribal Farm, 751 F.2d 1113, 1116
(9th Cir. 1985) quoting U.S. v. Farris, 624 F.2d 890, 893-94
(9th Cir. 1990), cert. denied, 449 U.S. 1111 (1981)).[5]
The Interstate Horseracing Act falls within the Tuscarora rule, as it is a general statute which by its terms is applied to all persons.
¶ 15 As noted above, the policies established in the Act were to further the horseracing and legal off-track betting industries "in the United States," suggesting that the Act was to have a nationwide effect. The general prohibition of the Act at15 U.S.C. § 3003, which requires that "[n]o person" may accept an interstate off-track wager except as provided under the Act, also suggests an intent that the Act have a broad and all encompassing scope and application as the Act, at 15 U.S.C. § 3002(1), defines the term "person" to include any organization or entity:
 "[P]erson" means any individual, association, partnership, joint venture, corporation, State or political subdivision thereof, department, agency, or instrumentality of a State or political subdivision thereof, or any other organization or entity[.]
15 U.S.C. § 3002(1) (emphasis added).
¶ 16 Given the Interstate Horseracing Act's broad scope and broad definition of "person," which includes "any other organization or entity," under the Tuscarora rule, the Act would apply to Indian Tribes, unless one of the three exceptions to the Tuscarora rule were present.
A. The Exclusive Rights Of Self-Government In Purely IntramuralMatters Exception
¶ 17 In discussing this exception, the Court of Appeals for the Ninth Circuit. in Donovan v. Coeur d'Alene Tribal Farm,751 F.2d 1113 (9th Cir. 1985), stated its belief that this exception "is designed to except purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes apply to Indian tribes." Id. at 1116.
¶ 18 While purely intramural matters of a Tribe's right to self-government may not be limited to this short laundry list,[6] the matters addressed in the provisions of the Interstate Horseracing Act are clearly not limited to purely intramural rights of self-government as the Act deals with conditions under which off-track wagering may be conducted on an interstate basis. Those interstate wagers involve not only the Tribe, but also involve racetracks in other states, horsemen and horsewomen in other states, as well as gamblers in other states. The situation presented by Congress' intent to establish a nationwide policy for interstate horserace wagering is similar in nature to Congress' establishment of a nationwide policy in the Safe Drinking Water Act, which, using the Tuscarora rule, the Court of Appeals for the Tenth Circuit held was applicable to Indian Tribes, in Phillips Petroleum Company v. U.S .E.P.A.,803 F.2d 545 (10th Cir. 1986). A contrary conclusion, as the Court held, would thwart the national policy by creating vacuums of authority in the Act's application:
 As indicated above, the SDWA clearly establishes national policy with respect to clean water,
including sources of underground water. To hold, as Phillips suggests, that the EPA did not have authority to promulgate underground injection control programs for Indian lands would contradict the clear meaning and purpose of the SDWA by creating, prior to 1986, a vacuum of authority over underground injections on Indian lands, leaving vast areas of the nation devoid of protection from groundwater contamination.
803 F.2d 545 at 555-56 (emphasis added).
¶ 19 As in the Phillips Petroleum case, the rights involved in the Interstate Horseracing Act are not of a purely intramural nature. As the Act does not deal with rights of self-government of a purely intramural nature, the first exception to theTuscarora rule is not present.
B. The "Treaty Rights" Exception
¶ 20 As noted above, one of the exceptions to the Tuscarora
rule occurs when application of the law to the Tribe would "abrogate rights guaranteed by Indian treaties." In describing this exception, the Court of Appeals for the Tenth Circuit, inPhillips Petroleum Co. v. U.S.E.P.A., 803 F.2d 545 (10th Cir. 1986), held that the Tuscarora rule of construction "can be rescinded where a tribe raises a specific right under a treaty
or statute which is in conflict with the general law to beapplied." Id. at 556 (emphasis added). Of course, whether this exception is present with respect to the application of any general federal law, including the Interstate Horseracing Act, must be decided on a Tribe-by-Tribe basis, after a review of the treaties, if any, that exist between the federal government and that particular Tribe.
C. The "Other Indication" Exception
¶ 21 The third exception to the Tuscarora rule is when proof exists by legislative history or some other means that Congress intended the law not to apply to Indian reservations. We have examined the legislative history for the Interstate Horseracing Act, Senate Report Nos. 95-554 and 95-117, published at 1978 U.S. Code Cong. Adm. News, pp. 4132-4154, and find nothing in that history indicating that Congress intended to exclude Indian Tribes from the Act's application. In the absence of any other indications that Congress had such an intent, we conclude that this exception to the Tuscarora rule is not applicable.
¶ 22 It is, therefore, the official Opinion of the AttorneyGeneral, that:
1. The provisions of the Interstate Horseracing Act,15 U.S.C. §§ 3001-3007, are, as a matter of federal mandate, applicable toa federally recognized Indian Tribe's acceptance of interstateoff-track wagers-legal wagers placed or accepted in one statewith respect to the outcome of a horserace taking place inanother state-unless the application of a specific provision ofthe Act "abrogates a specific right guaranteed in a treatybetween the United States Government and the particular Tribe."Of course, whether application of any of the Act's provisionswould abrogate a specific treaty right, must be decided on aTribe-by-Tribe basis.[7]
2. Even if the Interstate Horseracing Act,15 U.S.C. §§ 3001-3007, were not, as a matter of federal law applicable toan Indian Tribe, some or all of the Act's provisions couldnevertheless be applicable to a Tribe's acceptance of interstateoff-track wagers, if, in entering into a Tribal-State compactwith the State under the provisions of the Indian GamingRegulatory Act, 25 U.S.C. §§ 2701-2721, the Tribe agreed to theapplication of some or all of the Act's provisions.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
NEAL LEADER SENIOR ASSISTANT ATTORNEY GENERAL
[1] A "host racing association" is defined to mean "any person who, pursuant to a license or other permission granted by the host State, conducts the horserace subject to the interstate wager." 15 U.S.C. § 3002(9).
[2] 15 U.S.C. § 3002(10) defines "host racing commission" to mean "that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate the conduct of racing within the host State."
[3] Under the definitions set forth at 15 U.S.C. § 3002, the term "off-track racing commission" is defined at subsection (11) to mean "that person designated by State statute or, in the absence of statute, by regulation, with jurisdiction to regulate off-track betting in that State.
[4] At 15 U.S.C. § 3004(b)(2), the Act establishes exceptions to the requirement that off-track betting offices obtain the permission of currently operating tracks within 60 miles of the off-track betting office, prior to accepting interstate off-track wagers:
 Notwithstanding the provisions of paragraph (1) of this subsection, any off-track betting office in a State with at least 250 days of on-track parimutuel horseracing a year, may accept interstate off-track wagers for a total of 60 racing days and 25 special events a year without the approval required by paragraph (1), if with respect to such 60 racing days, there is no racing of the same type at the same time of day being conducted within the off-track betting State within 60 miles of the off-track betting office accepting the wager, or such racing program cannot be completed. Excluded from such 60 days and from the consent required by subsection (b)(1) of this section may be dark days which occur during a regularly scheduled race meeting in said off-track betting State. In order to accept any interstate off-track wager under the terms of the preceding sentence the off-track betting office shall make identical offers to any racing association described in subparagraph (A) of subsection (b)(1) of this section. Nothing in this subparagraph shall be construed to reduce or eliminate the necessity of obtaining all the approvals required by subsection (a) of this section.
[5] Though continuing to following the Tuscarora rule and its exceptions, the Court of Appeals for the Tenth Circuit on occasion has noted it has questions as to the continued viability of Tuscarora in light of the United States Supreme Court's decision in Merrion v. Jicarilla Apache Tribe,
455 U.S. 130(182). See, for example, EEOC v. Cherokee Nation,871 F.2d 937, 938 n. 3 (10th Cir. 1989).
As the Court of Appeals for the Ninth Circuit noted in its opinion in Donovan v. Coeur d'Alene Tribal Farm, 751 F.2d 1113,1117 (9th Cir. 1985), the Supreme Court's decision in Merrion v.Jicarilla Apache Tribe arose in a different context that that presented when the question involves whether Congress intended a general statute to be applicable to an Indian Tribe. InMerrion, the Supreme Court considered the "tribal power to tax non-Indians who enter reservations for commercial purposes and said that the right to exclude and tax non-Indians was a `hallmark' of sovereignty. It in no way addressed Congress' ability to modify those rights through the exercise of its plenary powers." Id.
[6] See Donovan v. Navajo Forest Products Industries,692 F.2d 709 (10th Cir. 1982) (Tribe's right to exclude non-Indians from land within the Tribe's jurisdiction held to be a right of self-government sufficient to remove the Tribe from theTuscarora rule being used to make the Tribe subject to the Occupational Safety and Health Act).
[7] In so concluding, we do not determine whether the Act abrogates an Indian Tribe's immunity from suit, thus making a Tribe subject to the Act's judicial remedies. That issue was not included in your question. We also note that the legal analysis used to address that issue is different from the analysis employed in this Opinion.