**EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION,**
Plaintiff–Appellee,

v.

**KARUK TRIBE HOUSING
AUTHORITY,** Defendant–
Appellant.

No. 00–16181.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 11, 2001

Filed Aug. 13, 2001

to an Indian tribe in connection with an age-discrimination investigation. Robert Grant, a member of the Karuk Tribe ("the Tribe") and an employee of the Karuk Tribe Housing Authority (the "Housing Authority"), filed an administrative complaint with the Equal Employment Opportunity Commission (the "EEOC"), alleging that he had been terminated because of his age. The EEOC opened an investigation and issued a subpoena to the Tribe, which refused to comply on the grounds that the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34 (the "ADEA"), does not apply to Indian tribes, and that the Tribe enjoys sovereign immunity from the EEOC investigation.

The EEOC sought judicial enforcement of the subpoena. The district court issued an order enforcing the subpoena, from which the Tribe now appeals. We reverse.

The threshold question is whether the Tribe is immune from suit. We conclude that it is not. We next address whether the Tribe is subject to the ADEA in these circumstances. We conclude that it is not. Resolution of this issue is a pure question of law that is currently ripe for review and, therefore, is best resolved at the subpoena-enforcement stage, rather than in potential downstream litigation. To hold otherwise would frustrate the regulatory scheme, ignore the special status of the Tribe, and subject the Tribe to an unnecessary compliance burden. Thus, because the ADEA does not apply to the Tribe's employment relationship with Grant, we conclude that the Tribe need not comply with the subpoena.

Robert M. Liechty and David Heisterkamp II (argued), Wagenlander and Heisterkamp, LLC, Denver, Colorado, for the defendant-appellant.

Barbara L. Sloan, Equal Employment Opportunity Commission, Washington, DC, for the plaintiff-appellee.

Before: HILL,* GRABER, and McKEOWN, Circuit Judges.

McKEOWN, Circuit Judge:

This case raises issues at the intersection of administrative, Indian, and anti-discrimination law. We must decide whether the district court properly enforced an administrative subpoena issued

## BACKGROUND

The Karuk Tribe Housing Authority owns 100 low-income housing units on trib-

---

* Honorable James C. Hill, Senior Circuit Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

al trust land in Northern California. The Tribe does not have its own reservation but instead occupies land held in trust by the United States. The Housing Authority, organized and authorized through a tribal ordinance, is a governmental arm of the Tribe. The Housing Authority, which provides safe and affordable housing to members of the Tribe, receives funding under the Native American Housing Assistance and Self–Determination Act, 25 U.S.C. §§ 4101–12. This legislation, passed in 1996, was particularly concerned with "the right of Indian self-determination and tribal self-governance." *Id.* § 4101(7). Although there is no formal requirement that only Tribe members may occupy the units, according to the Vice–Chairman of the Karuk Tribe and Acting Executive Director of the Karuk Tribe Housing Authority, ninety-nine of the units are occupied by Indian families. The record does not reveal how many of the Indians who occupy the units are members of the Tribe. According to the district court's order enforcing the subpoena, the Housing Authority employed twenty Indians and four non-Indians.

Grant, an enrolled member of the Tribe, worked as a maintenance supervisor for the Housing Authority for almost seven years, until he was terminated in November 1997. He was fifty-three years old at the time of his termination. Grant challenged his firing in internal tribal administrative proceedings, which are governed by written policies and procedures. After a hearing, the Board of Commissioners upheld the Housing Authority's actions. Grant further appealed to the Tribal Council, the highest governing body of the Tribe, which rejected his claim as well.

In February 1998, Grant filed a "Charge of Discrimination" with the EEOC on a standard form, alleging that he had been terminated because of his age.[2] The EEOC subsequently opened an investigation based on its purported authority under 29 U.S.C. § 626(a). Section 626(a) provides, "The Equal Employment Opportunity Commission shall have the power to make investigations and require the keeping of records necessary or appropriate for the administration of this chapter in accordance with the powers and procedures provided in sections 209 and 211 of this title." Section 211(a), which is relevant here, provides,

> The Administrator or his designated representatives may investigate and gather data regarding the wages, hours, and other conditions and practices of employment in any industry subject to this chapter, and may enter and inspect such places and such records (and make such transcriptions thereof), question such employees, and investigate such facts, conditions, practices, or matters as he may deem necessary or appropriate to determine whether any person has violated any provision of this chapter, or which may aid in the enforcement of the provisions of this chapter.

The EEOC served on the Tribe a copy of the charge, along with a request for a written position statement and a list of questions. The Tribe responded that it would not provide the information, based on its position that the ADEA does not apply to Indian tribes. In March 1999, the EEOC served on the Housing Authority's custodian of records an administrative subpoena seeking various employment records. The Tribe responded with a letter explaining that it would not provide the requested information, again based on its

---

**2.** The ADEA prohibits discrimination in specified employment practices based on age. 29 U.S.C. § 623. Its prohibitions apply only to employees at least forty years of age. *Id.* § 631.

view that the EEOC does not have jurisdiction over Indian tribes.

The EEOC filed an application to enforce the administrative subpoena in the United States District Court for the Northern District of California. The district court held that "the EEOC has jurisdiction over Indian tribes for the purpose of enforcing the ADEA," granted the EEOC's application, and issued an enforcement order. The Tribe timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## DISCUSSION

### I. TRIBAL SOVEREIGN IMMUNITY

 As a threshold matter, we first address the Tribe's contention that it enjoys sovereign immunity from the EEOC's inquiry and thus from this lawsuit. It is true that Indian tribes do, as a general rule, enjoy sovereign immunity from private lawsuits. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). Indian tribes do not, however, enjoy sovereign immunity from suits brought by the federal government. *Quileute Indian Tribe v. Babbitt,* 18 F.3d 1456, 1459–60 (9th Cir.1994); *United States v. Yakima Tribal Court,* 806 F.2d 853, 861 (9th Cir.1986); *United States v. Red Lake Band of Chippewa Indians,* 827 F.2d 380, 383 (8th Cir.1987) ("We conclude that just as a state may not assert sovereign immunity as against the federal government, *[United States v.] Mississippi,* 380 U.S. [128], 140–41, 85 S.Ct. 808, 13 L.Ed.2d 717 [ (1965) ], neither may an Indian tribe, as a dependent nation, do so. Tribal sovereign immunity may not be asserted against the United States...."); William C. Canby, Jr., *American Indian Law* 88 (3d ed. 1998) ("Tribes are not immune from suits by the United States.").

 The Tribe attempts to circumvent the clear rule that Indian tribes do not enjoy sovereign immunity against suits brought by the federal government by arguing that, for these purposes, the EEOC "is merely a federal commission and does not act as the United States itself." This argument finds no support. The EEOC is an entity created by Congress and is specifically authorized by statute to enforce the ADEA, through both administrative action and litigation. 29 U.S.C. § 626. We know of no principle of law (and the Tribe does not cite any) that differentiates a federal agency such as the EEOC from "the United States itself" for the purpose of sovereign immunity analysis.

### II. ADMINISTRATIVE SUBPOENA ENFORCEMENT

It bears repeating that we are not confronted here with an age-discrimination suit brought under the ADEA. Rather, the parties to this action have only reached the investigative stage, and this litigation is a suit to enforce an administrative subpoena. Before considering the applicability of the ADEA to the Tribe, therefore, we must first determine whether we should reach that question at this stage of the proceedings.

We begin with the Supreme Court's decision in *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943). In *Endicott Johnson,* Secretary of Labor Frances Perkins issued an administrative subpoena to the petitioner, a government contractor, in the course of an investigation to determine whether the petitioner had violated the Walsh–Healey Act. *Id.* at 505–07, 63 S.Ct. 339. Notably, the Walsh–Healey Act "applies only to contractors who voluntarily enter into competition to obtain government business on terms of which they are fairly forewarned by inclusion in the contract." *Id.* at 507, 63 S.Ct. 339. The petitioner argued that he was not required to comply with the subpoena because the alleged vio-

lations of the Act occurred in plants that were not involved in government work and, therefore, were not covered by the Act. *Id.* at 505–07, 63 S.Ct. 339. Stating that "[t]he evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose of the Secretary in the discharge of her duties under the Act," the Supreme Court concluded that the subpoena should be enforced and that the question whether the Secretary had identified true violations of the Act could be resolved at a later stage of the proceedings. *Id.* at 508–09, 63 S.Ct. 339.

The principle of *Endicott Johnson*—that courts should not refuse to enforce an administrative subpoena when confronted by a fact-based claim regarding coverage or compliance with the law—has been consistently reaffirmed by the Supreme Court. *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 216, 66 S.Ct. 494, 90 L.Ed. 614 (1946); *United States v. Morton Salt Co.*, 338 U.S. 632, 652–53, 70 S.Ct. 357, 94 L.Ed. 401 (1950); *United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). It is also alive and well in this circuit, as illustrated by *EEOC v. Children's Hospital Medical Center*, 719 F.2d 1426 (9th Cir. 1983) (en banc), which sets forth current law governing the permissible grounds for challenging an administrative subpoena. In *Children's Hospital*, a private, class-action race discrimination suit ended with a consent decree. After entry of the consent decree, three employees filed claims with the EEOC against the hospital. The EEOC issued administrative subpoenas to the hospital, which refused to comply on the ground that any claims against the hospital were barred by the res judicata effect of the consent decree. The district court agreed with the hospital, reasoning that the EEOC lacked jurisdiction over the hospital because of the consent decree. *Id.* at 1427.

This court reversed, holding that it was premature to address the res judicata issue when the only action pending was litigation over enforcement of the administrative subpoenas. As we explained:

> The scope of the judicial inquiry in an EEOC or any other agency subpoena enforcement proceeding is quite narrow. The critical questions are: (1) whether Congress has granted the authority to investigate; (2) whether procedural requirements have been followed; and (3) whether the evidence is relevant and material to the investigation.

*Id.* at 1428 (citing, *inter alia*, *Endicott Johnson*, 317 U.S. at 508–09, 63 S.Ct. 339; *Okla. Press Publ'g*, 327 U.S. at 216, 66 S.Ct. 494; *Morton Salt*, 338 U.S. at 652–53, 70 S.Ct. 357; *Powell*, 379 U.S. at 57–58, 85 S.Ct. 248). Put another way, courts must enforce administrative subpoenas unless "the evidence sought by the subpoena [is] 'plainly incompetent or irrelevant' to 'any lawful purpose' of the agency." *Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 433 (9th Cir.1975) (quoting *Endicott Johnson*, 317 U.S. at 509, 63 S.Ct. 339). Thus, in *Children's Hospital*, whether res judicata might bar a subsequent lawsuit was simply irrelevant to the inquiry whether the EEOC could issue administrative subpoenas that might uncover evidence for use in a later lawsuit: "[A] party may not defeat agency authority to investigate with a claim that could be a defense if the agency subsequently decides to bring an action against it." 719 F.2d at 1429; *see also, e.g., Pac. Mar. Ass'n v. Quinn*, 491 F.2d 1294, 1296 (9th Cir.1974) (party may not raise a factually disputed statute-of-limitations defense in a challenge to an administrative subpoena).

The general rule of *Endicott Johnson* in favor of enforcement of administrative subpoenas thus stands. But it is not absolute. Although a party may not

avoid an administrative subpoena on the ground that it has a valid defense to a potential subsequent lawsuit, such a challenge may, in limited circumstances, be mounted when the defense raised is "jurisdictional" in nature—i.e., when the agency lacks jurisdiction over the subject of the investigation. *See Marshall v. Burlington Northern, Inc.,* 595 F.2d 511, 513 (9th Cir. 1979) (noting that judicial determination of agency jurisdiction prior to exhaustion is limited). But even where this exception is concerned, the role of a court reviewing a subpoena attacked on jurisdictional grounds is "strictly limited." *Casey v. FTC,* 578 F.2d 793, 799 (9th Cir.1978). "As long as the evidence sought is relevant, material and there is some 'plausible' ground for jurisdiction, or to phrase it another way, unless jurisdiction is 'plainly lacking,' the court should enforce the subpoena." *Children's Hospital,* 719 F.2d at 1430 (quoting *Burlington Northern,* 595 F.2d at 513).

■ Despite these seemingly straightforward ground rules, the inquiry into administrative subpoenas has been complicated by the fact that the words "coverage" and "jurisdiction" are sometimes used interchangeably, and often imprecisely. *See, e.g., Marshall v. Able Contractors, Inc.,* 573 F.2d 1055, 1056–57 (9th Cir.1978); *Port of Seattle,* 521 F.2d at 436; *Reich v. Great Lakes Indian Fish & Wildlife Comm'n,* 4 F.3d 490, 491–92 (7th Cir.1993). It is important to differentiate "coverage" from "jurisdiction," because these two different sorts of challenges lead to different results: factual challenges based on a lack of statutory "coverage" are clearly not permitted, *see Endicott Johnson,* 317 U.S. at 508–10, 63 S.Ct. 339; *Okla. Press Publ'g,* 327 U.S. at 214, 66 S.Ct. 494, while challenges based on "jurisdiction" may, in certain circumstances, result in a refusal to enforce a subpoena, *see Great Lakes,* 4

F.3d at 491–92; *Burlington Northern,* 595 F.2d at 513.

This distinction is not merely semantic. There is a difference, particularly in the case of an Indian tribe, between the determination whether an agency has regulatory jurisdiction to enforce a subpoena in the first instance, and the very different question whether a subpoena recipient has a defense to liability under the applicable statute.

■ Here, the Tribe's challenge to the EEOC subpoena—that the ADEA does not apply to Indian tribes, and that it enjoys sovereign immunity from the EEOC investigation—falls into a narrow category of cases that is ripe for determination at the enforcement stage. Our approach is consistent with *Burlington Northern,* where we held in the context of an Occupational Safety and Health Administration ("OSHA") inspection that

> [j]udicial intervention prior to an agency's initial determination of its jurisdiction is appropriate only where: (1) there is clear evidence that exhaustion of administrative remedies will result in irreparable injury; (2) the agency's jurisdiction is plainly lacking; and (3) the agency's special expertise will be of no help on the question of its jurisdiction.

595 F.2d at 513. Assuming that the Tribe is correct in its analysis with respect to jurisdiction, the prejudice of subjecting the Tribe to a subpoena for which the agency does not have jurisdiction results in irreparable injury vis-a-vis the Tribe's sovereignty. In addition, the EEOC does not have special expertise in interpretation of statutes with respect to Indians. By contrast, this special circumstance was not present in *Burlington Northern.*

For similar reasons, this case is also unlike *Endicott Johnson* and *Children's Hospital.* Both of those decisions involved parties that were clearly subject to the

federal laws that authorized the administrative investigations. The questions that those courts declined to resolve concerned potential defenses to enforcement actions. In both cases, because the subpoenaed parties could, under some set of facts, be found in violation of federal law, it made sense for the court not to adjudicate the parties' fact-specific defenses at the administrative subpoena stage.

In juxtaposition, this case presents the question whether the Karuk Tribe Housing Authority, in its role as Grant's employer, is subject to the ADEA *at all,* whatever the facts of the actual discrimination charge may be. The Tribe asserts that it falls into a category of entity not subject to the ADEA, and thus not subject to investigation by the EEOC. Whether this is so is a pure question of law, the resolution of which does not depend on a factual inquiry, and which would not undermine the role of subpoena enforcement actions as "summary procedure[s]" designed to allow "speedy investigation of EEOC charges." *EEOC v. St. Regis Paper Co.,* 717 F.2d 1302, 1304 (9th Cir.1983).

 Here the jurisdictional question is particularly sensitive because it involves the Karuk Tribe, which, like other tribes, enjoys a unique legal status as a sovereign. *See Montana v. Blackfeet Tribe,* 471 U.S. 759, 764, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). In this context, the prejudice from compliance is real. *See Great Lakes,* 4 F.3d at 492 ("The Commission should not be burdened with having to comply with a subpoena if, as the district court believed, the agency issuing it has no jurisdiction to regulate the wages that the Commission pays. Questions of regulatory jurisdiction are properly addressed at the subpoena-enforcement stage if, as here, they are ripe for determination at that stage. Compli-

ance with a subpoena is a burden, and one that a person or institution that can show it is not subject to the regulatory regime in aid of which the subpoena was issued should not be required to bear." (citations omitted)); [3] *see also EEOC v. Cherokee Nation,* 871 F.2d 937 (10th Cir.1989) (adjudicating issue of applicability of the ADEA to Indian tribes in the context of a subpoena enforcement action). The Tribe's challenge to the EEOC's administrative subpoena is jurisdictional in nature and thus may be resolved here as a matter of law.

### III. APPLICABILITY OF THE ADEA TO INDIAN TRIBES

 We thus turn to the substantive issue in this case: whether the Tribe is subject to the ADEA in its role as Grant's employer. Our starting point in analyzing whether a federal statute applies to tribes is *Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. 99, 120, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), in which the Supreme Court held that "general acts of Congress apply to Indians as well as to all others in the absence of a clear expression to the contrary." We have, however, carved out certain exceptions to this rule of general applicability. Where, as here, a statute is silent with respect to Indians, *see* 29 U.S.C. § 630 (defining entities subject to the ADEA), we follow the rule set forth in *Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113, 1116 (9th Cir.1985):

A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches "exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guar-

---

**3.** Although we generally agree with the logic of the approach to administrative subpoena enforcement adopted by the Seventh Circuit

in *Great Lakes,* we note that the opinion does not address *Endicott Johnson* or other related Supreme Court precedent.

anteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations...." In any of these three situations, Congress must *expressly* apply a statute to Indians before we will hold that it reaches them.

(emphasis in original) (quoting *United States v. Farris*, 624 F.2d 890, 893–94 (9th Cir.1980)). The parties to this appeal agree that only the first *Coeur d'Alene* exception—whether "the law touches exclusive rights of self-governance in purely intramural matters," 751 F.2d at 1116—is at issue here.

In *Coeur d'Alene* itself, we addressed the first exception, holding that the Occupational Safety and Health Act, 29 U.S.C. §§ 651 *et seq.*, applied to a commercial farm operated by a tribe. We explained that "the tribal self-government exception is designed to except purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes apply to Indian tribes." *Coeur d'Alene*, 751 F.2d at 1116. We must decide, then, whether employment practices at the Karuk Tribe Housing Authority are "purely intramural matters" touching on the tribe's "exclusive rights of self-governance." If so, the statute does not apply in these circumstances.

The two other circuits to confront this issue, the Eighth and the Tenth, have conducted such a "self-governance" analysis in determining whether the ADEA applies to tribal employers. Both reached the conclusion that the ADEA did not apply in the particular circumstances presented. *See EEOC v. Fond du Lac Heavy Equip. & Constr. Co., Inc.*, 986 F.2d 246 (8th Cir. 1993); *EEOC v. Cherokee Nation*, 871 F.2d 937 (10th Cir.1989).

In *Fond du Lac*, a tribal member brought an ADEA claim against his employer, a company located on the reservation and wholly owned by the tribe. 986 F.2d at 248. The Eighth Circuit framed the issue by noting that " 'areas traditionally left to tribal self government, those most often the subject of treaties, have enjoyed an exception from the general rule that congressional enactments, in terms applying to all persons, includes Indians and their property interests.' " *Id.* (quoting *United States v. White*, 508 F.2d 453, 455 (8th Cir.1974)). The court went on to apply those general principles to alleged age discrimination within tribes:

The facts in this case reveal that this dispute involves a strictly internal matter. The dispute is between an Indian applicant and an Indian tribal employer. The Indian applicant is a member of the tribe, and the business is located on the reservation. Subjecting such an employment relationship between the tribal member and his tribe to federal control and supervision dilutes the sovereignty of the tribe. The consideration of a tribe member's age by a tribal employer should be allowed to be restricted (or not restricted) by the tribe in accordance with its culture and traditions. Likewise, disputes regarding this issue should be allowed to be resolved internally within the tribe. Federal regulation of the tribal employer's consideration of age in determining whether to hire the member of the tribe to work at the business located on the reservation interferes with an intramural matter that has traditionally been left to the tribe's self-government.

*Fond du Lac*, 986 F.2d at 249.

In analyzing the same issue, the Tenth Circuit in *Cherokee Nation* reached the same result via different reasoning. It relied on the second *Coeur d'Alene* exception (as opposed to general principles of Indian sovereignty cited in *Fond du Lac)*,

finding a right to tribal self-government derived from a treaty "unequivocally recogniz[ing] tribal self-government." 871 F.2d at 938. That discussion is relevant here, however, because "[t]he identical right should not have a different effect because it arises from general treaty language rather than recognized, inherent sovereign rights." *United States Dep't of Labor v. Occupational Safety & Health Review Comm'n*, 935 F.2d 182, 186 (9th Cir.1991). The Tenth Circuit did not specifically explain how the application of the ADEA to the tribe—in particular, to its employment relationship with an employee of a tribal health care service—would infringe on the right to self-government. Instead, the court stated that, because the ADEA is silent on its applicability to Indian tribes, and rules of statutory construction require that ambiguous provisions be construed "liberally in favor of the Indians," *Blackfeet Tribe*, 471 U.S. at 766, 105 S.Ct. 2399, the ADEA does not apply to Indian tribes.

Although our analysis differs somewhat, we reach the same result as both the Eighth and Tenth Circuits and hold that the ADEA does not apply to Grant's employment relationship with the Karuk Tribe Housing Authority because it touches on "purely internal matters" related to the tribe's self-governance.

Notably, the employer in this case is the tribal government, acting in its role as provider of a governmental service: ensuring adequate housing for its members. The federal law that provides funds for the Housing Authority specifies that such funds "should be provided in a manner that recognizes the right of Indian self-determination and tribal self-governance":

(2) there exists a unique relationship between the Government of the United States and the governments of Indian tribes and a unique Federal responsibility to Indian people; ... (6) ... the Federal Government should work ... to achieve the goals of economic self-sufficiency and self-determination for tribes and their members; and (7) Federal assistance to meet these responsibilities should be provided in a manner that recognizes the right of Indian self-determination and tribal self-governance....

25 U.S.C. § 4101. The legislation highlights the importance of "affordable homes in safe and healthy environments on Indian reservations [and] in Indian communities," as a means to achieve "self-sufficiency and self-determination." *Id.*

The Housing Authority thus functions as an arm of the tribal government and in a governmental role. It is not simply a business entity that happens to be run by a tribe or its members, but, rather, occupies a role quintessentially related to self-governance. Courts conducting "self-governance" analysis have distinguished such essentially governmental functions from commercial activities undertaken by tribes and have classified actual tribal governmental entities as aspects of "self-government," *see, e.g., Fond du Lac*, 986 F.2d at 246; *Cherokee Nation*, 871 F.2d at 937, while rejecting such a categorization for businesses that happen to be owned and operated by tribes, *see, e.g., Fla. Paraplegic Ass'n, Inc. v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1129 (11th Cir.1999) ("tribe-run business enterprises acting in interstate commerce do not fall under the 'self-governance' exception" to *Coeur d'Alene;* the enterprise at issue "does not relate to the governmental functions of the Tribe, nor does it operate exclusively within the domain of the Tribe and its members"); *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 181 (2d Cir.1996) (OSHA has jurisdiction over a tribe-owned business because the "nature of MSG's work, its employment of non-Indians, and the construction work on a hotel and casino that operates in interstate

commerce—when viewed as a whole, result in a mosaic that is distinctly inconsistent with the portrait of an Indian tribe exercising exclusive rights of self-governance in purely intramural matters"); *Occupational Safety & Health Review Comm'n,* 935 F.2d at 184 (tribal employer is subject to OSHA because it "employs a significant number of non-Native Americans and sells virtually all of its finished product to non-Native Americans through channels of interstate commerce"); *Coeur d'Alene,* 751 F.2d at 1116 ("The operation of a farm that sells produce on the open market and in interstate commerce is not an aspect of tribal self-government. Because the Farm . . . is in virtually every respect a normal commercial farming enterprise, we believe that its operation free of federal health and safety regulations is 'neither profoundly intramural . . . nor essential to self-government.'" (quoting *Farris,* 624 F.2d at 893)).

Further, the dispute here is entirely "intramural," between the tribal government and a member of the Tribe. *See Fond du Lac,* 986 F.2d at 249 ("The dispute is between an Indian applicant and an Indian tribal employer. The Indian applicant is a member of the tribe, and the business is located on the reservation."). It does not concern non-Karuks or non-Indians as employers, employees, customers, or anything else. *See Mashantucket Sand & Gravel,* 95 F.3d at 181 ("MSG's employment of non-Indians weighs heavily against its claim that its activities affect rights of self-governance in purely intramural matters. In general, tribal relations with non-Indians fall outside the normal ambit of tribal self-government. Furthermore, intramural matters generally consist of conduct the immediate ramifications of which are felt primarily within the reservation by members of the tribe.") (citing *Farris,* 624 F.2d at 893). The intramural nature of the dispute here is underscored by the fact that the Tribe has an established internal process for adjudicating such matters, a process of which Grant availed himself. *See Fond du Lac,* 986 F.2d at 249 ("[D]isputes regarding this issue should be allowed to be resolved internally within the tribe.").

■ Our conclusion is further bolstered by general acceptance of the notion that the term "tribal self-government," or a similar term, encompasses a tribe's ability to make at least certain employment decisions without interference from other sovereigns. *See, e.g., Penobscot Nation v. Fellencer,* 164 F.3d 706, 709–11 (1st Cir.), *cert. denied,* 527 U.S. 1022, 119 S.Ct. 2367, 144 L.Ed.2d 771 (1999) (tribe not subject to a state anti-discrimination statute in discharging a non-Indian from position as nurse in tribe-run health center); *Pink v. Modoc Indian Health Project, Inc.,* 157 F.3d 1185, 1188 (9th Cir.1998) (Indian has no cause of action under Title VII against a tribal non-profit entity which "served as an arm of the sovereign tribes, acting as more than a mere business"); *Great Lakes,* 4 F.3d at 494–96 ("it has been traditional to leave the administration of Indian affairs for the most part to Indians themselves"; U.S. Department of Labor had sought to investigate tribal commission for alleged violations of the Fair Labor Standards Act).

■ The EEOC maintains that this case may be resolved by applying traditional rules of statutory construction without regard to the *Coeur d'Alene* "self-governance" exception to the *Tuscarora* rule. Its suggestion misses the mark for two reasons: (1) we are bound by the *Coeur d'Alene* exceptions adopted by the Ninth Circuit, and (2) the standard rules of statutory construction do not adhere in Indian law. The EEOC is correct that, under traditional rules of statutory construction, it can be argued logically that the ADEA does apply to Indian tribes.

The definitions of "employer" in Title VII and the ADEA are nearly identical, except that Title VII, which was enacted three years before the ADEA, specifically exempts Indian tribes from its coverage. *Compare* 29 U.S.C. § 630 (ADEA) (silence as to Indian tribes) *with* 42 U.S.C. § 2000e(b)(1) (Title VII) (explicit exclusion of Indian tribes from statutory coverage). Given that Congress is presumed to act with deliberation when drafting statutes, *see United States v. Motamedi,* 767 F.2d 1403, 1406 (9th Cir.1985), Congress' explicit exemption of Indian tribes from Title VII's coverage could lead to the conclusion that it intended not to include such an Indian exemption in the ADEA, *see Binder v. Long Island Lighting Co.,* 933 F.2d 187, 193 (2d Cir.1991) ("[O]mission in the text of the ADEA of a provision found in Title VII is likely to reflect a deliberate decision on Congress's part.").

Such analysis, however, does not account for the rule that "the standard principles of statutory construction do not have their usual force in cases involving Indian law." *Blackfeet Tribe,* 471 U.S. at 766, 105 S.Ct. 2399. Rather, "[b]ecause of the unique legal status of Indians in American jurisprudence, legal doctrines often must be viewed from a different perspective from that which would obtain in other areas of the law." *Native Village of Venetie I.R.A. Council v. Alaska,* 944 F.2d 548, 553 (9th Cir.1991); *see also County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ("The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. Thus, it is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.... The Court has applied similar canons of construction in nontreaty matters." (citations omitted)); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 152,

102 S.Ct. 894, 71 L.Ed.2d 21 (1982) ("[I]f there [is] ambiguity ..., the doubt would benefit the Tribe, for '[a]mbiguities in federal law have been construed generously in order to comport with ... traditional notions of sovereignty and with the federal policy of encouraging tribal independence.'" (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143–44, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980))). Thus we do not apply the normal rules of statutory construction here, but, instead, must be guided by doctrine specific to Indian law—the *Coeur d'Alene* exception that we applied above.

In sum, we conclude that regulation of the employment relationship between the Housing Authority and Grant does "touch[ ] exclusive rights of self-governance in purely intramural matters," *Coeur d'Alene,* 751 F.2d at 1116. Because this exception to the *Tuscarora* rule, 362 U.S. at 120, applies, the ADEA is applicable to Indian tribes only if Congress explicitly so indicated. *See Coeur d'Alene,* 751 F.2d at 1116 (if any of the exceptions applies, "Congress must *expressly* apply a statute to Indians before we will hold that it reaches them" (emphasis in original)). The ADEA contains no such explicit reference; indeed, as noted above, the ADEA is silent as to its applicability to Indian tribes. Therefore, under *Coeur d'Alene,* the statute does not apply in these circumstances.

CONCLUSION

Because federal regulation of the employment relationship between the Karuk Tribe Housing Authority and Grant would "touch[ ] exclusive rights of self-governance in purely intramural matters," *Coeur d'Alene,* 751 F.2d at 1116, the ADEA does not apply in these circumstances. Thus, the EEOC is without regulatory jurisdiction over the Tribe with respect to the

ADEA, and the district court should not have enforced the subpoena.

REVERSED.