**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, *Petitioner-Appellee*, <br><br> v. <br><br> GREAT PLAINS LENDING, LLC; MOBILOANS, LLC; PLAIN GREEN, LLC, *Respondents-Appellants*. | No. 14-55900 <br><br> D.C. No. 2:14-cv-02090-MWF-PLA <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted June 6, 2016
Pasadena, California

Filed January 20, 2017

Before: Ferdinand F. Fernandez, Johnnie B. Rawlinson,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Rawlinson

# SUMMARY[*]

**Tribal Issues / Consumer Financial Protection Bureau**

The panel affirmed the district court's decision compelling Tribal Lending Entities to comply with civil investigative demands issued by the Consumer Financial Protection Bureau.

The Tribal entities are for-profit lending companies created by the Chippewa Cree, Tunica Biloxi and Otoe Missouria Tribes (the "Tribes"). The Bureau initiated an investigation into the Tribal Lending Entities to determine whether small-dollar lenders violated federal consumer financial laws. The Tribes directed the Tribal Lending Entities not to respond to the investigative demands.

The panel held that the Consumer Financial Protection Act was a law of general applicability, and it applied to tribal businesses, like the Tribal Lending Entities involved in this appeal. The panel further held that Congress did not expressly exclude Tribes from the Bureau's enforcement authority. The panel also held that none of the three exceptions in *Donovan v. Coeur d'Alene Tribal Farms*, 751 F.2d 1113, 1115 (9th Cir. 1985), to the enforcement of generally applicable laws against Indian tribes applied to this case. The panel concluded that the district court properly held that the Bureau did not plainly lack jurisdiction to issue investigative demands to the tribal corporate entities under the Act.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Neal Kumar Katyal (argued), Frederick Liu, and Morgan L. Goodspeed, Hogan Lovells US LLP, Washington, D.C., for Respondents-Appellants.

Kristin Bateman (argued) and Lawrence DeMille-Wagman, Attorneys; John R. Coleman, Assistant General Counsel; To-Quyen Truong, Deputy General Counsel; Meredith Fuchs, General Counsel; Consumer Financial Protection Bureau, Washington, D.C.; for Petitioner-Appellee.

## OPINION

RAWLINSON, Circuit Judge:

Appellants Great Plains Lending, LLC, Mobiloans, LLC, and Plain Green, LLC (collectively, Tribal Lending Entities) appeal from the district court's decision compelling the Tribal Lending Entities to comply with civil investigative demands (investigative demands) issued by Appellee Consumer Financial Protection Bureau (Bureau). The Tribal Lending Entities maintain that they are not subject to the Bureau's jurisdiction because the entities were created and operated by several recognized tribes, and are thereby cloaked in tribal sovereign immunity. The Tribal Lending Entities assert that, because the Consumer Financial Protection Act of 2010 (the Act)[1] defines the term "State" as including Native American tribes, the Tribal Lending Entities, as arms of sovereign

---

[1] The Act is part of the Dodd-Frank Wall Street Reform and Consumer Protection Act. *See* Title X, Pub. L. No. 111-203, July 21, 2010, 124 Stat 1376.

tribes, are not required to comply with the investigative demands. We disagree with the argument made by the Tribal Lending Entities that the inclusion of tribes in the Act's definition of "State" impliedly excludes the Tribal Lending Entities from regulation under the Act, and therefore AFFIRM the decision of the district court enforcing the investigative demands.

## I.  BACKGROUND

This appeal stems from the creation of several Tribal Lending Entities as for-profit lending companies by the Chippewa Cree, Tunica Biloxi, and Otoe Missouria Tribes (collectively, Tribes). The Tribes established regulatory frameworks for consumer lending by these Tribal Lending Entities.

In addition to regulation by the Tribes, the Tribal Lending Entities came to the attention of the Bureau, which initiated an investigation into the Tribal Lending Entities by serving investigative demands. The Bureau explained that:

> The purpose of this investigation is to determine whether small-dollar online lenders or other unnamed persons have engaged or are engaging in unlawful acts or practices relating to the advertising, marketing, provision, or collection of small-dollar loan products, in violation of Section 1036 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. § 5536, the Truth in Lending Act, 15 U.S.C. § 1601, the Electronic Funds Transfer Act, 15 U.S.C. § 1693, the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6802-6809, or

any other Federal consumer financial law. The purpose of this investigation is also to determine whether Bureau action to obtain legal or equitable relief would be in the public interest.

The Tribes directed the Tribal Lending Entities not to respond to the investigative demands, and informed the Bureau that it lacked jurisdiction to investigate lending entities created and operated by the Tribes. Rather, the Tribes offered to cooperate with the Bureau as co-regulators of consumer lending services.

When the offer of cooperative regulation was rejected by the Bureau, the Tribes petitioned the Bureau to set aside the investigative demands. The Bureau denied the Tribes' petition, and sought enforcement of the investigative demands in federal court. The district court then issued an order to show cause as to why the Tribal Lending Entities should not comply with the investigative demands.

Relying primarily on our ruling in *Donovan v. Coeur d'Alene Tribal Farms*, 751 F.2d 1113, 1115 (9th Cir. 1985), the district court concluded that the Act, as an act of general applicability, was enforceable against the Tribal Lending Entities. The district court rejected the Tribal Lending Entities' reliance on the holding in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 780 (2000) that the statutory definition of the term "person" typically excludes "the sovereign." The district court noted the unlikelihood that *Stevens* overruled subsequent Ninth Circuit authority restating the holding in *Coeur d'Alene*. Instead, the district court found it persuasive that "[t]he *Stevens* and *Coeur d'Alene* presumptions have . . .

existed side by side for decades" without so much as a suggestion of "an inescapable conflict between them." The district court reasoned that the cases were indeed reconcilable because the Supreme Court had not definitively held that the holding in *Stevens* applied to actions brought by the federal government against "the sovereign."

The district court was also not swayed by the Tribes' argument that, because the Act treats the states and tribes as co-regulators, Congress did not intend to vest authority in the Bureau to regulate tribal entities in the absence of cooperation with tribal regulators. The district court emphasized that:

> textually, the [Act] is not silent with respect to Indian tribes. . . . The exclusion of statutes that are not silent with respect to Indian tribes is intended to avoid undermining the expressed intent of Congress. Congress does not express such intent by merely mentioning Indian tribes as sovereign regulators, while remaining silent on whether the unrelated provision at issue is also intended to regulate Indian tribes.

> Put simply, there is no provision of the [Act] that expressly or impliedly suggests that the defined terms "persons" and "States" are mutually exclusive. Accordingly, the provision creating the Bureau's authority to investigate "persons" is silent with respect to the tribes.

Finally, the district court referenced the lack of any convincing legislative history bearing on the issue.

Following the district court's denying the Tribal Lending Entities' petition to set aside the Bureau's investigative demands, the Tribal Lending Entities filed a timely notice of appeal.

## II. STANDARD OF REVIEW

We review *de novo* whether the Bureau plainly lacked jurisdiction to issue the investigative demands. *See Nat'l Labor Relations Bd. v. Chapa De Indian Health Program Inc.*, 316 F.3d 995, 997–98 (9th Cir. 2003).[2]

## III.    DISCUSSION

### A. The Bureau's Jurisdiction to Investigate the Tribal Lending Entities' Activities

Consistent with their argument before the district court, the Tribal Lending Entities contend on appeal that the Act does not confer authority upon the Bureau to investigate tribal entities. The Tribal Lending Entities repeat their assertion

---

[2]    Although the Tribal Lending Entities maintain that the "plainly lacking" jurisdictional standard is inapplicable, we have consistently applied this standard in assessing an agency's jurisdiction at the investigative stage. *See EEOC v. Fed. Express Corp.*, 558 F.3d 842, 848 (9th Cir. 2009), *as amended* ("Regarding whether Congress has granted the authority to investigate, we have emphasized the strictly limited role of the district court when an agency subpoena is attacked for lack of jurisdiction. As long as the evidence is relevant, material and there is some plausible ground for jurisdiction, or, to phrase it another way, *unless jurisdiction is plainly lacking, the court should enforce the subpoena*.") (citations and internal quotation marks omitted) (emphasis added); *see also Gen. Atomics v. U.S. Nuclear Regulatory Comm'n*, 75 F.3d 536, 541 (9th Cir. 1996); *Marshall v. Burlington N., Inc.*, 595 F.2d 511, 513 (9th Cir. 1979), *as amended*.

that the Act limits the Bureau's authority to "persons," which excludes sovereign entities. The Tribal Lending Entities add that Congress did not intend for the definition of "person" to encompass tribal entities because the Act explicitly includes tribes in the definition of "State" in 12 U.S.C. § 5481(27).

Before we address the merits of the Tribal Lending Entities' arguments, a delineation of the Act's statutory framework is in order. Pursuant to the expressed statutory purpose of the Act:

> The Bureau shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.

12 U.S.C. § 5511(a). The "primary functions" of the Bureau include "collecting, investigating, and responding to consumer complaints," and, to accomplish its objectives, "[t]he Bureau is authorized to exercise its authorities under Federal consumer financial law" to ensure that "consumers are protected from unfair, deceptive, or abusive acts and practices and from discrimination." 12 U.S.C. § 5511(b), (c)(2). In terms of its enforcement authority,

> Whenever the Bureau has reason to believe that any *person* may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to a violation, the

Bureau may, before the institution of any proceedings under the Federal consumer financial law, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to – (A) produce such documentary material for inspection and copying or reproduction in the form or medium requested by the Bureau; (B) submit such tangible things; (C) file written reports or answers to questions; (D) give oral testimony concerning documentary material, tangible things, or other information; or (E) furnish any combination of such material, answers, or testimony.

12 U.S.C. § 5562(c) (emphasis added). The Act defines "person" as "an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative, organization, or other entity." 12 U.S.C. § 5481(19).

The Act also addresses the role "States" may play in supporting the goals of the Act. The Act defines "State" to include "any State, territory, or possession of the United States" including "any federally recognized Indian tribe, as defined by the Secretary of the Interior . . . ," 12 U.S.C. § 5481(27), and compels the Board to "coordinate with . . . State regulators, as appropriate, to promote consistent regulatory treatment of consumer financial and investment products and services." 12 U.S.C. § 5495. Under the Act, States are also authorized to "bring a civil action" to enforce provisions of the Act. The only entities excluded from the enforcement authority of the state are national banks and federal savings associations. 12 U.S.C. § 5552(a)(2)(A). No

entities are expressly excluded from the enforcement authority of the Bureau. *See* 12 U.S.C. § 5481(6) (defining "covered person" without exception).

Because the Act by its terms applies broadly and without exception, it is properly characterized as a law of general applicability. *See Federal Power Commission v. Tuscarora Indian Nation*, 80 S.Ct. 543, 553 (1960). We have consistently held that similar laws of general applicability govern tribal entities unless Congress has explicitly provided otherwise. Most notably, in *Coeur d'Alene*, we considered whether the Occupational Safety and Health Act (OSHA) applied to tribal entities. *See* 751 F.2d at 1114–15. We observed that OSHA's definition of "employer" as an "organized group of persons engaged in a business affecting commerce who has employees" encompassed a tribal farm operating as a commercial enterprise. *Id.* at 1115 n.1 (alteration omitted). We recognized that "Congress expressly excluded only the United States or any State or any political subdivision of a State from the broad definition of employer in the Act." *Id.* (citation and internal quotation marks omitted). We explained that:

> No one doubts that the Tribe has the inherent sovereign right to regulate the health and safety of workers in tribal enterprises. But neither is there any doubt that Congress has the power to modify or extinguish that right. Unlike the states, Indian tribes possess only a limited sovereignty that is subject to complete defeasance. . . .

*Id.* at 1115 (citations omitted). We emphasized that "[m]any of our decisions have upheld the application of general

federal laws to Indian tribes; not one has held that an otherwise applicable statute should be interpreted to exclude Indians. . . ." *Id.* (citations omitted). As a result, we eschewed "the proposition that Indian tribes are subject only to those laws of the United States expressly made applicable to them. . . ." *Id.* at 1116. At the same time, we recognized the following three exceptions to enforcement of generally applicable laws against tribes:

> A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches exclusive rights of self-governance in purely intramural matters; (2) the application of the law to the tribe would abrogate rights guaranteed by Indian treaties; or (3) there is proof by legislative history or some other means that Congress intended the law not to apply to Indians on their reservations.

*Id.* (citation, alterations, and internal quotation marks omitted). "In any of these three situations, Congress must *expressly* apply a statute to Indians before we will hold that it reaches them." *Id.* (emphasis in the original).

We have consistently applied *Coeur d'Alene* and its progeny to hold that generally applicable laws may be enforced against tribal enterprises. *See Solis v. Matheson*, 563 F.3d 425, 432 (9th Cir. 2009) (observing that "[o]ther cases have similarly affirmed the application of OSHA, the Employee Retirement Income Security Act (ERISA), and the Americans with Disabilities Act (ADA) to tribal businesses") (citations omitted). In keeping with our precedent, we similarly conclude that the Consumer Financial Protection

Act, a law of general applicability, applies to tribal businesses like the Tribal Lending Entities involved in this appeal. *See Chapa De*, 316 F.3d at 1002.

Relying on *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), the Tribal Lending Entities contend that our precedent departs from the United States Supreme Court's holding that the statutory term "person" generally excludes sovereign entities, such as states and Native American tribes. In *Stevens*, the Supreme Court considered "whether a private individual may bring suit in federal court on behalf of the United States against a State (or state agency) under the False Claims Act." *Id.* at 768 (citation omitted). The Supreme Court reasoned that, in considering application of the False Claims Act to "any person," the Court was required to take into account its "longstanding interpretive presumption that 'person' does not include the sovereign." *Id.* at 780 (citations omitted). The Supreme Court added that "[t]he presumption is particularly applicable where it is claimed that Congress has subjected the States to liability to which they had not been subject before." *Id.* at 780–81 (citations and internal quotation marks omitted). However, "[t]he presumption is, of course, not a hard and fast rule of exclusion, but . . . may be disregarded only upon some affirmative showing of statutory intent to the contrary." *Id.* at 781 (citations and internal quotation marks omitted). The Supreme Court observed that, in "another section of the [False Claims Act] . . . which enables the Attorney General to issue civil investigative demands," the statute includes a provision "expressly defining 'person' for purposes of this section to include States . . ." *Id.* at 783–84 (citations and footnote reference omitted). Additionally, the False Claims Act imposes punitive damages "which would be inconsistent with state *qui tam* liability in light of the

presumption against imposition of punitive damages on governmental entities. . . ." *Id.* at 784–85 (citation and footnote reference omitted); *see also Will v. Michigan Department of State Police*, 491 U.S. 58, 67–68 (1989) (holding that a state is not a "person" under 42 U.S.C. § 1983 because "[i]t is an established principle of jurisprudence that the sovereign cannot be sued in its own courts without its consent. . . .") (citation and internal quotation marks omitted).

At first blush, the Tribal Lending Entities' reliance on *Stevens*, a decision predating our precedent focusing on the general applicability of the law in question, has surface appeal.    However, the "equivalence" provision in the Consumer Financial Protection Act only provides definitional guidance for later references in the statute only to the term "State."  This "equivalence" provision simply clarifies that the term "State" includes "any federally recognized Indian tribe, as defined by the Secretary of the Interior . . ."  12 U.S.C. § 5481(27).  It does not expressly provide that tribes are excluded from the definition of "person" or from the Bureau's enforcement authority under the Act.  In sum, the Tribal Lending Entities' interpretation of the equivalence provision reads far too much into a simple definition.  We are not persuaded at this stage of the litigation that we should intervene to nullify the Bureau's issuance of investigative demands specifically provided for in the Act on the basis that jurisdiction is "plainly lacking."  *Chapa De*, 316 F.3d at 1002.[3]

---

[3]    The Bureau maintains in the alternative that the investigative demands are enforceable because it is unclear if the Tribal Lending Entities are actually arms of the tribe.  We conclude that, at this preliminary stage, the record is sufficient to demonstrate that the Tribes have an interest in challenging the investigative demands based on their

Furthermore, none of the three *Coeur d'Alene* exceptions to the enforcement of generally applicable laws against Indian tribes apply in this case. *See* 751 F.2d at 1116. It is undisputed that the Tribal Lending Entities are engaged in the business activity of small-dollar lending over the Internet, reaching customers who are not members of the Tribes, or indeed, have any relation to the Tribes other than as debtors to the Tribal Lending Entities. Thus, the first *Coeur d'Alene* exception—whether "the law touches exclusive rights of self-governance in purely intramural matters—does not apply. *Coeur d'Alene*, 751 F.2d at 1116 (internal quotation marks omitted). Unlike the activities of the Housing Authority at issue in *EEOC v. Karuk Tribe Housing Authority*, 260 F.3d 1071 (9th Cir. 2001), the small-dollar lending activities in this case do not touch upon purely intramural matters involving self-goverance.[4] The Tribal Lending Entities do not argue

_____

creation and operation of the Tribal Lending Entities. *See Cook v. AVI Casino, Enter. Inc.*, 548 F.3d 718, 726 (9th Cir. 2008) (concluding that a business was an arm of the tribe because it was created "pursuant to a tribal ordinance . . . and the tribal corporation is wholly owned and managed by the Tribe").

[4] In *Karuk Tribe Housing Authority*, 260 F.3d at 1073–74, we applied the *Coeur d'Alene* framework to the Karuk Tribe Housing Authority, a governmental arm of the Karuk Tribe. A member of the Karuk Tribe filed a complaint with the EEOC, asserting that his employment with the Housing Authority was terminated in violation of the Age Discrimination in Employment Act. *See id.* at 1074. The EEOC opened an investigation and issued an administrative subpoena seeking employment records from the Karuk Tribe. The Tribe refused to comply, disputing the EEOC's jurisdiction over Indian tribes. *See id.* at 1074–76. The EEOC petitioned for enforcement of the subpoena, and the district court granted the petition. *See id.* at 1075. On appeal, we applied the *Coeur d'Alene* framework, focusing on the first exception in *Coeur d'Alene*—whether "the law touches exclusive rights of self-governance in purely intramural matters." *Id.* at 1079 (citation omitted). We noted that

that the second exception—covering situations in which the application of a statute would abrogate Indian treaty rights—applies in this case, so we do not address it here.

With respect to the third exception, the Tribal Lending Entities' assertion that the Act's legislative history supports a finding of lack of jurisdiction is unpersuasive. In considering the *Coeur d'Alene* exception concerning legislative history, we have explained that for the exception to apply, "there must be proof that Congress intended the statute not to apply to Indians on their reservations." *Chapa De*, 316 F.3d at 1000–01 (citation, alteration, and internal quotation marks omitted). We rejected the tribe's reliance on the legislative history of the National Labor Relations Act (NLRA) because that history failed to reflect that "Congress intended the NLRA not to apply to Indian tribes" or to the particular activities of the tribal entity at issue. *Id.* at 1001. Ultimately, we determined that despite the existence of one out-of-circuit case offering some support for the tribe's position, the tribe nevertheless failed to demonstrate that jurisdiction was "*plainly lacking*." *Id.* at 1002 (emphasis in the original).

---

the Housing Authority functioned as an arm of the Karuk Tribe and provided a governmental service—ensuring adequate housing for members of the Karuk Tribe. *See id.* at 1080. Moreover, the dispute at issue was "purely intramural," because it was between a member of the Karuk Tribe, and the tribe itself. *Id.* at 1081. We therefore reversed the district court's decision enforcing the subpoena. *See id.* at 1083. We considered it relevant that the Housing Authority "is not simply a business entity that happens to be run by a tribe or its members" and that the dispute "d[id] not concern non-Karuks or non-Indians as employers, employees, customers, or anything else." *Id.* at 1080–81.

Here, the Tribal Lending Entities maintain that Congress' decision to include tribes within the definition of "State" and not the definition of "person" reflects an intent to exclude tribes from the Bureau's enforcement purview. *See* H.R. Rep. No. 111-370, 2009 WL 4724255. However, these attenuated references do not demonstrate that jurisdiction is "plainly lacking" or that "Congress intended the [Act] not to apply to Indian tribes, or to [the tribes'] activities." *Chapa De*, 316 F.3d at 1001–02. At best, the referenced report reflects only the addition of tribes to the definition of "State," without any expressed intent to cloak the tribes with immunity from enforcement of the Act as a generally applicable congressional enactment. *See* H.R. Rep. No. 111-370, 2009 WL 4724255, at *36. In addition, the lack of immunity is particularly evident in this case because "Indian tribes do not . . . enjoy sovereign immunity from suits brought by the federal government." *Karuk Tribe*, 260 F.3d at 1075 (citation omitted).

The Tribal Lending Entities also failed to persuasively establish that Congress intended to exclude tribes from enforcement of the Act by virtue of the promotion of cooperation between the States and the federal government. The statutes relied upon by the Tribal Lending Entities do not reflect mutual exclusivity of the Bureau's investigative authority and the States' potential co-regulator status. For example, 12 U.S.C. § 5495 instructs the Bureau to coordinate with "State regulators, *as appropriate* . . ." (emphasis added). Similarly, in support of the Act's promotion of "consistent regulatory treatment," *id.*, 12 U.S.C. § 5512(c)(6)(C)(i) provides that "a State regulator . . . having jurisdiction over a covered person . . . shall have access to any report of examination made by the Bureau with respect to such person . . ." These coordination provisions of the Act in no way

restrict the Bureau's jurisdiction to investigate covered entities simply because the States have a measure of co-regulatory status. Indeed, the Act limits the extent of the States' co-regulatory authority. By way of example, 12 U.S.C. § 5552(b)(1)(A) forbids a State from initiating independent court proceedings against a covered entity. Instead, the State must consult with the Bureau and "timely provide a copy of the complete complaint to be filed and written notice describing such action or proceeding to the Bureau . . ." Upon receiving the requisite notice, the Bureau may "intervene in the action as a party," "remove the action to the appropriate United States district court," and "be heard on all matters arising in the action . . ." 12 U.S.C. § 5552(b)(2)(B). Moreover, with absolutely no mention of States or tribes, the Act limits investigative powers, such as issuance of investigative demands and subpoenas, to the Bureau. *See* 12 U.S.C. § 5562(b)–(c).[5]

The Tribal Lending Entities also argue that limitations upon the Bureau's enforcement authority vis-à-vis the States under 12 U.S.C. § 5517 demonstrate that Congress did not intend to include States or tribal entities within the definition of "person." However, § 5517 does not bolster the Tribal Lending Entities' argument, as it merely reflects that when Congress intended to limit the Bureau's authority, it did so explicitly. With great specificity, 12 U.S.C. § 5517 delineates that the Bureau lacks authority over merchants and retailers of nonfinancial services and goods, *see id.*, § 5517(a); real estate brokerage activities, *see id.*, § 5517(b); modular home

---

[5]   Nothing we say in this opinion should be construed as a ruling addressing whatsoever any authority the Bureau may or may not have to regulate or to direct subpoenas to the State or to State enterprises. That issue is not before us.

retailers and manufactured home retailers, *see id.*, § 5517(c); tax preparers and accountants, *see id.*, § 5517(d); the practice of law, *see id.*, § 5517(e); and persons regulated by state insurance and securities commissions. *See id.*, § 5517(f), (h). Section 5517 also excludes persons regulated by the Commodities Futures Trading Commission and the Farm Credit Administration. *See id.*, § 5517(j)–(k). Notably absent from these extensive exclusions is any mention of tribal corporate entities. We are persuaded by these provisions that, had Congress intended to exclude tribal entities from the Bureau's enforcement purview, it would have done so explicitly as it did with other entities.

*Davis v. Pringle*, 268 U.S. 315 (1925) does not compel a contrary conclusion. In that case, the Supreme Court rejected the United States' priority claim under the Bankruptcy Act then in effect. *See id.* at 318–19. The Supreme Court stated that the United States was not entitled to priority for its bankruptcy claim because Congress could not have "intended to smuggle in a general preference by muffled words at the end" of a statutory provision. *Id.* at 318. The Supreme Court noted the "conspicuous mention of the United States . . . at the beginning of the section and the grant of a limited priority[.]" *Id.* The Supreme Court also observed that "[e]lsewhere in cases of possible doubt when the Act means the United States it says the United States. . . ." *Id.* The Supreme Court did not confront or address the exclusion by implication argument raised by the Tribal Lending Entities in this appeal. Rather, in *Davis*, the Supreme Court construed a statute that specifically mentioned the United States relative to the substantive provisions of the bankruptcy priority framework. *See id.* That circumstance is vastly different from relying on the Act's definitional provisions to cloak tribal corporate entities with sovereign immunity merely

because tribes are mentioned in the Act's definition of "States." In any event, the general statutory interpretation approach expounded in *Davis* does not in any way undermine our binding precedent that laws of general applicability may be enforced against the tribes unless Congress expressly provides otherwise. *See Coeur d'Alene*, 751 F.2d at 1115–16.

Finally, relying on *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992) and *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767–68 (1985), the Tribal Lending Entities assert that any ambiguity in the Act must be resolved in their favor. The Supreme Court has recognized that, when confronted with two plausible statutory constructions, "our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *County of Yakima*, 502 U.S. at 269 (citation and alteration omitted). Nevertheless, we have repudiated this presumption in the face of our governing precedent concluding that to apply the presumption to laws of general applicability "would be effectively to overrule, [*Coeur d'Alene*], which, of course, this panel cannot do." *Chapa De*, 316 F.3d at 999 (citation omitted).

At this stage of the proceedings, we conclude that the district court properly held that the Bureau does not plainly lack jurisdiction to issue investigative demands to the tribal corporate entities under the Act. *See id.* at 1002. Although the Tribal Lending Entities make some appealing arguments, none of the arguments suffices to breach or evade the barrier to their success provided by the *Coeur d'Alene* revetment.

## IV.    CONCLUSION

We have consistently held in our post-*Stevens* precedent that generally applicable laws apply to Native American tribes unless Congress expressly provides otherwise.  In the Consumer Financial Protection Act, a generally applicable law, Congress did not expressly exclude tribes from the Bureau's enforcement authority.  Although the Act defines "State" to include Native American tribes, with States occupying limited co-regulatory roles, this wording falls far short of demonstrating that the Bureau plainly lacks jurisdiction to issue the investigative demands challenged in this case, or that Congress intended to exclude Native American tribes from the Act's enforcement provisions.  Neither have the Tribes offered any legislative history compelling a contrary conclusion regarding congressional intent.  At this stage of the proceedings, we affirm the district court's order enforcing the investigative demands against the Tribal Lending Entities.

**AFFIRMED.**